Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA 90802
Telephone: 310-896-5813
E-mail: wes@almeidalawgroup.com

Margot P. Cutter, SBN 306789
**CUTTER LAW P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone: 916-290-9400
E-mail: mcutter@cutterlaw.com

F. Peter Silva II, SBN 348070
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: 202-973-0900
E-mail: psilva@tzlegal.com

James Bilsborrow, *pro hac vice* to be filed
**WEITZ & LUXENBERG PC**
700 Broadway
New York, NY 10003
Telephone: 212-558-5500
E-mail: jbilsborrow@weitzlux.com

[Additional Counsel on Signature Page]

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| O'SEAN HEAD, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>UNDERDOG SPORTS, LLC d/b/a UNDERDOG FANTASY, AND DOES 1-10,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR MONETARY AND INJUNCTIVE RELIEF**<br><br>**Jury Trial Demanded** |

-1-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1.      Plaintiff O'Sean Head brings the following allegations on behalf of himself and all others similarly situated, based on his personal knowledge as to the facts pertaining to Plaintiff, and based on the investigation of counsel and information and belief as to all other allegations:

## I.    INTRODUCTION

2.      For years, Defendant Underdog Sports LLC d/b/a Underdog Fantasy ("Underdog") has been operating mobile gambling applications and websites within California (collectively, the "Gambling Websites"), representing to customers and the public that its daily fantasy sports contests, such as "Drafts" and "Pick'em," are legal forms of gambling in California. They are not.

3.      Plaintiff O'Sean Head ("Plaintiff"), on behalf of himself and the proposed class of similarly situated Californians, brings this lawsuit to stop the unlawful gambling that occurs on Underdog's Gambling Websites in California and to recover the money that Underdog has unlawfully taken from him and the proposed class.

## II.    PARTIES

**A.    Plaintiff.**

4.      At all times relevant to this action, Plaintiff Head was over the age of 18 and was a resident of Contra Costa County, California.

**B.    Defendants.**

5.      Defendant Underdog Sports, LLC d/b/a Underdog Fantasy is a limited liability company organized and existing under the laws of California with its principal place of business in North Hollywood, California.

6.      Underdog regularly conducts business within California and this District, including by running the illegal Gambling Websites that are the subject of this litigation.

7.      On information and belief, Does 1-10 are individuals and/or entities who facilitate Underdog's unlawful practices described in this Complaint. The identities of Does 1-10 are not presently known to Plaintiff. The Doe defendants, along with defendant Underdog, are collectively referred to in this Complaint as "Defendants."

8.      Plaintiff expressly reserves his right to amend this Complaint to add the Doe defendants by name, once their identities are known.

-2-

### III.    JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

10.    The United States District Court for the Northern District of California has personal jurisdiction over the parties in this matter because Plaintiff Head resides in Contra Costa County. Underdog regularly conducts business within this District, including by engaging in the unlawful gambling practices that are at the center of this action.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Plaintiff Head resides in Contra Costa County, and Underdog's unlawful actions, which are the subject of this action, occurred in Contra Costa County, among other locations within California.

12.    Pursuant to California Civil Code Section 1780(d), a declaration from Plaintiff Head is attached as **Exhibit A** confirming that venue is proper.

### IV.    DIVISIONAL ASSIGNMENT

13.    Pursuant to Local Rules 3.2(c) and 3.5(b), Plaintiff Head further states that assignment to the San Francisco and Oakland Division of this Court is proper because Plaintiff Head resides in Contra Costa County, and many of the events at issue in this lawsuit occurred in Contra Costa County, which pursuant to Local Rule 3-2(d) provides for assignment to this Division.

### V.    FACTUAL ALLEGATIONS

**A.    California's Longstanding Ban on Gambling.**

14.    For over 150 years, California has broadly prohibited commercialized gambling.

15.    For example, in 1872, California enacted Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . *any banking or percentage game* played with . . . *any device*, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330 (emphasis added).

16.    A "banking game" refers to a situation where the "house" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v.*

*Fox,* 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants, but is not directly involved in game play. *See id. at* 679.

17.    Similarly, California Penal Code Section 337a prohibits additional conduct, including:

- "*Pool selling* or *bookmaking*, with or without writing, at *any time or place*." CAL. PENAL CODE § 337a(a)(1) (emphasis added).

- *"[R]eceiv[ing], hold[ing], or forward[ing]* . . . in *any manner whatsoever*, any *money . . . staked, pledged, bet or wagered*, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance of *person* or animal, or between *persons*, animals, or *mechanical apparatus*, or *upon the result, or purported result, of any* lot, chance, casualty, *unknown or contingent event whatsoever." Id.* at (a)(3) (emphasis added).

- "[A]t *any time or place, record[ing], or register[ing] any bet* or bets, *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of *skill*, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*, or upon the result, or purported result, *of any* lot, chance, casualty, *unknown or contingent event whatsoever." Id.* at (a)(4) (emphasis added).

- "*[O]ffer[ing] or accept[ing] any bet* or bets, or *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus." Id.* at (a)(6) (emphasis added).

18.    The terms used in Section 337a have their commonsense meanings. For example, the California Court of Appeal has explained that "'[p]ool selling' is the selling or distribution of shares or chances in a wagering pool," such as when money wagered by all participants is combined

into a single pool and the winnings are distributed based on predetermined rules. *See Finster v. Keller,* 18 Cal. App. 3d 836, 846 (1971) (cleaned up). And "'[b]ookmaking' is the making of a betting book and includes the taking of bets, [and] [t]he taking of one bet is sufficient" to constitute "bookmaking." *People v. Thompson*, 206 Cal. App. 2d 734, 739 (1962) (cleaned up).

19.    Similarly, "bet" and "wager" have their commonsense meanings. For example, the Judicial Council of California Criminal Jury Instructions (2025 Edition) provides that a "bet is a wager or agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest." CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE § 337a(a)(3)) (cleaned up).[1]

20.    "Bets" and "wagers" include entry fees paid in online fantasy sports. *Los Angeles Turf Club v. Horse Racing Labs, LLC*, 2017 WL 11634526, at *8 (C.D. Cal. May 15, 2017).

21.    Put simply, a company violates California Penal Code Section 337a when it engages in pool selling, bookmaking, or accepts or records any bets or wagers on the result of any contest and/or any unknown or contingent event whatsoever—including, without limitation, bets associated with the performance of persons, such as in fantasy sports.[2]

22.    Moreover, various sections of the California Penal Code prohibit "lotteries" and "games of chance."

23.    For example, Penal Code Sections 320 and 321 make the operation of a lottery unlawful: "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor"[3] and "[e]very person who sells, gives, or in any manner whatever, furnishes or transfers to or for any other person any ticket, chance, share, or interest, or any paper, certificate,

---

[1] Available online at https://www.justia.com/criminal/docs/calcrim/2900/2993/ (last visited June 30, 2025).

[2] While Section 337a violations are reduced to infractions in certain circumstances for gambling in amounts below $2,500, the Section 337a reductions expressly do "not apply to . . . [a]ny bet, bets, wager, wagers, or betting pool or pools made online." CAL. PENAL CODE § 336.9(b)(1).

[3] CAL. PENAL CODE § 320.

or instrument purporting or understood to be or to represent any ticket, chance, share, or interest in, or depending upon the event of any lottery, is guilty of a misdemeanor."[4] Penal Code Section 319 defines a lottery broadly to include "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." CAL. PENAL CODE § 319.

24.     Similarly, Penal Code Section 330a makes it unlawful to own or operate any "contrivance, appliance, or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded . . . [that] is won or lost . . . dependent upon hazard or chance." CAL. PENAL CODE § 330a.

25.     And Penal Code Section 337j makes it unlawful to operate a "game of chance" or to "receive, directly or indirectly, any compensation" for operating such a game "*without having first procured . . . all federal, state, and local licenses required by law*." CAL. PENAL CODE § 337j. (emphasis added).

26.     In fact, as the California legislature re-affirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

**B.     Supermajorities of the California Electorate Rejected the Gambling Industry's Attempts to Legalize Sports Betting in 2022.**

27.     In 2022, two ballot initiatives were put to the California voters to legalize certain additional forms of gambling in the state, including various forms of sports betting: Proposition 26 and Proposition 27.

---

[4] CAL. PENAL CODE § 321.

28.    **Proposition 26** was primarily sponsored by California's Native American tribes, and, among other things, would have:

- Legalized in-person sports betting at tribal casinos.
- Allowed additional gambling at tribal casinos, including roulette and dice games like craps.
- Established certain taxes and fees associated with sports betting.

29.    Proposition 26, however, was soundly rejected in November 2022, with approximately 67% of the California electorate voting "no."

30.    **Proposition 27** aimed to legalize online sports betting in California, and was primarily sponsored by the online sports betting industry, with the Washington Post reporting that "the industry ultimately spent $150 million on political ads"[5] in an attempt to legalize online gambling in California.

31.    Among other things, Proposition 27 would have:

- Legalized and regulated online sports betting in California.
- Established a new division within the California Department of Justice to set license requirements and oversee the industry.
- Imposed a 10% tax on sports betting revenue and established licensing fees.
- Allocated revenue from online gambling to homelessness prevention.

32.    Proposition 27 was also soundly rejected in November 2022, with 82% of the electorate voting "no," making it one of the largest margins of defeat in California ballot proposition history.

**C.    California's Ongoing Investigation into Daily Fantasy Sports Betting.**

33.    Despite the resounding defeats at the ballot box, online sports betting operators, like Underdog, have continued to operate in California.

---

[5] Gus Garcia-Roberts, *Inside the $400 million fight to control California sports betting,* WASH. POST (Nov. 3, 2022), https://www.washingtonpost.com/sports/2022/11/03/prop-26-27-california-sports-betting/ (last visited July 1, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

34.     In particular, "daily fantasy sports" betting has proliferated in the state.

35.     Daily fantasy sports, which are often referred to by the abbreviation "DFS," are a subset of fantasy sports games that are generally played online through gambling websites:

> As with traditional fantasy sports games, [in daily fantasy sports], players compete against others by building a team of professional athletes from a particular league or competition while remaining under a salary cap, and earn points based on the actual statistical performance of the players in real-world competitions.
>
> Daily fantasy sports are an accelerated variant of traditional fantasy sports that are conducted over short-term periods, such as a week or single day of competition, as opposed to those that are played across an entire season.
>
> Daily fantasy sports are typically structured in the form of paid competitions typically referred to as a "contest"; winners receive a share of a pre-determined pot funded by their entry fees. A portion of entry fee payments go to the provider as rake revenue.[6]

36.     According to the California Business Journal, "California residents are estimated to contribute as much as 10% of the total entries in DFS contests nationwide. This popularity has translated into substantial revenue, with DFS platforms raking in approximately $200 million in entry fees annually [in California]."[7]

37.     In response to these massive ongoing daily fantasy sports betting operations in California, on or about October 5, 2023, State Senator Scott Wilk wrote to the California Department of Justice and requested an investigation into daily fantasy sports betting:

> I write to request a legal opinion as to whether California law prohibits the offering and operation of daily fantasy sports betting platforms with players physically located within the State of California, regardless of whether the operators and associated technology are located within or outside of the State.
>
> Pursuant to California law, no one may operate "any game of chance" without the required federal, state, and local licenses. No one has "the right to operate a gambling enterprise except as may be

---

[6]     *Daily    Fantasy    Sports,*    Wikipedia,    available    online    at https://en.wikipedia.org/wiki/Daily_fantasy_sports#cite_ref-sg-dk500k_1-0 (last visited June 30, 2025).

[7] *Unfenced Playground: A Peek into California's Daily Fantasy Sports Landscape, California Business Journal,* available online at https://calbizjournal.com/unfenced-playground-a-peek-into-californias-daily-fantasy-sports-landscape/#:~:text=In%20fact%2C%20California%20residents%20are,million%20in%20entry%20fees%20annually (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

> expressly permitted by the laws of this state and by the ordinances of local governmental bodies."
>
> In 2022, California voters overwhelmingly rejected Proposition 27 to legalize online sports wagering. Although sports wagering in all forms remains illegal in California, online daily fantasy sports betting is proliferating throughout the state. Through these online platforms, a participant pays to enter a contest in which they may win a prize depending on how well athletes perform. Although the participant may utilize their knowledge of a particular sport in choosing their "team" of players, how well those players perform during a game is completely out of the participant's control. As such, *daily fantasy sports appears to be a game of chance not otherwise permitted by the laws of California.*

(Cleaned up; footnotes omitted; emphasis added).[8]

38.     Consistent with the Senator's request, the California Department of Justice directed the Attorney General's Opinion Unit to address the following question:

> Does California law prohibit the offering and operation of daily fantasy sports betting platforms with players physically located within the State of California, regardless of whether the operators and associated technology are located within or outside of the State?

Opinion Request No. 23-1001.[9]

39.     As of the time of the filing of this lawsuit, no opinion has been issued from the Attorney General's Office.[10]

**D.    Underdog's California Fantasy Sports Gambling Operations.**

40.     Underdog has been operating in California since at least 2020 through the Gambling Websites, which consist of at least the Underdog's mobile apps for Android and IOS and the Underdog website, UnderdogFantasy.com, and associated subpages. The primary gambling products that Underdog currently offers in California are "Drafts" and "Pick'em." Underdog represents to its customers that Drafts and Pick'em contests are legal in California. They are not.

---

[8] A copy of the letter is publicly available online at https://www.legalsportsreport.com/wp-content/uploads/2023/11/OU-23-1001-Sen.-Wilk-request-1.pdf (last visited June 30, 2025).

[9] Available online at https://oag.ca.gov/opinions/monthly-report (last visited July 1, 2025).

[10] Plaintiff's counsel have "subscribed" to the Legal Opinions of the Attorney General Monthly Opinion Report and understand that they will receive an email notification once an opinion issues. Plaintiff's counsel will promptly notify the Court regarding any relevant updates they receive.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

### 1.    Underdog's Illegal "Drafts" Contests

41.    The first gambling product that Underdog currently offers in California is "Drafts." According to Underdog's website, there are several different types of Drafts, including "Battle Royal," "Best Ball," "Best Ball: Playoff Weekly Winners," and "Best Ball: Weekly Winners."[11]

42.    Regardless of which "Draft" type is selected, each contest has the same basic structure—users place bets with Underdog regarding the expected future actual performance of athletes (i.e., in the underlying sporting games). Underdog collects the sums wagered by users and pools the bets together into a "prize pool." Underdog records the bets on its ledger (i.e., its "betting book"). The underlying sporting event occurs "in real life" (i.e., at the relevant sporting arena(s)). Underdog uses its records and the records from the sporting event(s) to determine the outcome of the "fantasy" contest. Underdog pays out the winners from the prize pool. And finally, Underdog determines the share of the prize pool of bets that it keeps.

43.    For example, the following image depicts a Drafts contest that Underdog was offering in California on June 30, 2025:



44.    In the first contest depicted, called "7th Inning Stretch," users are presented the option to participate in a Draft tournament in which they will select MLB players in a series of draft

---

[11] https://underdogfantasy.com/rules (last visited June 30, 2025).

rounds and may advance in the tournament based on the real-life performance of the athletes.  Users were required to bet $10 to participate, with 11,040 participants expected to enter the betting pool.  As a result, the total prize pool collected by Underdog for the contest was $110,400.  Despite pooling $110,400 in bets, Underdog elected to only make $100,000 of the pooled bets available to payout as winnings, taking a rake of 10.4% of total wagers.



/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

45.     Underdog also offers Drafts in which fewer users participate for single-event contests. For example, on the July 1, 2025 WNBA game between Indiana and Minnesota, Underdog offered a $500 contest involving two users. Here is an image showing the bet slip offered by Underdog:



46.     As reflected on the betting slip, the total betting prize pool collected by Underdog for the contest was $1,000, of which Underdog paid out $900 in winnings.  As such, Underdog's rake for this contest was 10% or $100 from the prize pool.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

47.    The same is true on the Underdog apps, for example:




48.    Put simply, while the specific bet and wager amounts, number of participants, total betting funds pooled, payouts made, and funds retained by Underdog vary from fantasy contest to fantasy contest, the same basic betting structure remains: users place bets with Underdog regarding the expected future actual performance of athletes (i.e., in the underlying sporting games). Underdog collects the sums wagered by users and pools the bets together into a "prize pool." Underdog records the bets on its ledger (i.e., its "betting book"). The underlying sporting event occurs "in real life" (i.e., at the relevant sporting arena(s)). Underdog uses its records and the records from the sporting event(s) to determine the outcome of the Draft contest. Underdog pays out the winners from the prize pool. And finally, Underdog determines the share of the prize pool of bets that it keeps.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

49.    Moreover, "[c]hance affects the result not only as to the person or persons to receive the pool proceeds, but as to the amount received by any winning player, since more than one player may have selected the [same winning combination on] a particular day." *Finster*, 18 Cal. App. 3d at 845.

50.    Put simply, the outcomes are contingent and unknown at the time the bets and wagers are collected, recorded (i.e., booked), and pooled by Underdog. And as a result, Underdog violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.

**2.    Underdog's Illegal "Pick'em" Contests**

51.    The second gambling product that Underdog currently offers in California is "Pick'em."   On its website, Underdog states that it offers two forms of Pick'em contests, "Higher/Lower" and "Rivals."

52.    For **"Higher/Lower"** contests, Underdog provides the following instructions to users: "Pick whether a player's final stats will be higher or lower than their projection.  Get all your picks right and you win! You have to make at least two picks from players on different teams, and you can't pick the same player more than once."[12]

53.    The following image shows "Higher/Lower" Pick'em contest options available to Underdog users in California on June 30, 2025:



_____
[12] https://underdogfantasy.com/pick-em/higher-lower/all/home (last visited June 30, 2025) (click on the "Pick'em tips" button to view these instructions in a pop-up window).

54.     Each projection, or statistical line, for Underdog's "Higher/Lower" Pick'em contest options is set by Underdog, not any user.

55.     For **"Rivals"** contests, Underdog selects two players and presents users with the option of choosing which of those two players will perform better or worse with respect to a given stat category such as points, goals, or yards.[13] Here is an example from June 2025:




/ / /

/ / /

/ / /

---

[13] https://underdogfantasy.com/rules/pick-em (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

56.     Once the user has selected at least two picks from players on different teams, the user will be prompted to select whether to make a "Standard" bet or a "Flex" bet, as reflected in the bottom third of this bet slip:



57.     A user may choose to learn more about the "Standard" and "Flex" gambling options for Underdog's "Higher/Lower" Pick'em contests, by navigating to the "Underdog Fantasy: Rules" landing page.[14]   Those rules show that a "Flex" option permits a user to "miss" a pick—i.e., incorrectly choose "Higher" or "Lower"—and still win the bet, but the payout multipliers for "Flex" options are less than those for "Standard" bets.  "Standard" bets only pay if the user correctly selects each "Higher" or "Lower" betting option.

---

[14] https://underdogfantasy.com/rules/pick-em (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

58.     Underdog contest results and payment amounts are based entirely on a pre-set formula set by Underdog and not based on the results of any other user's performance. Here is the chart Underdog provides regarding payouts on winning bets:

## Winning and payouts ^

Your winnings and payouts may change for a variety of reasons, such as selecting alt lines and scorcher picks. Payouts include the entry fee being paid back, and the base payouts for standard entries are:

| Pick Count | Standard | Flexed | Flexed | Flexed |
|---|---|---|---|---|
| - | Missed 0 | Missed 0 | Missed 1 | Missed 2 |
| 2 | 3x | - | - | - |
| 3 | 6x | 3x | 1x | - |
| 4 | 10x | 6x | 1.5x | - |
| 5 | 20x | 10x | 2.5x | - |
| 6 | 35x | 25x | 2.6x | 0.25x |
| 7 | 65x | 40x | 2.75x | 0.5x |
| 8 | 120x | 80x | 3x | 1x |

59.     Finally, the user is prompted to choose the amount to bet and submit the bet to Underdog by selecting the "Play" button.[15]

60.     If the user completes the wager, he has a chance to win based on the betting line and terms set by Underdog. He has no ability to change or modify the outcome of the contest once his bet is placed, and other users' performances do not have any impact on the outcome of the contest. Only the athletes' actual performances in the selected statistical category (i.e., at the live sporting event) determines the outcome of the Pick'em contest.

---

[15] The same basic structure for Underdog "Pick'em" remains true when Underdog bets are placed on the Underdog apps.

61.    After the underlying sports competitions resolve, Underdog uses its records (i.e., its betting book) to determine the winners and losers and make payments to winners from its funds (i.e., from the "bank").

62.    Ultimately, regardless of which Pick'em sporting event type Underdog customers select, the specific "Higher" and "Lower" for each athlete chosen, or the amounts bet, the customers have no control over the outcome of the contest they have wagered on. The outcome is determined entirely based on athletes' actual in-game performances (i.e., the athletes' performance in the actual underlying sporting events) and are entirely outside of the customers' control.

63.    Put simply, the outcomes of the Pick'em contests are contingent and unknown at the time the bets and wagers are collected and recorded (i.e., booked) by Underdog, and as a result, Underdog's Pick'em contests violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.[16]

**3.    Underdog's "Pick'em" Contests Differ Significantly from Traditional Fantasy Sports.**

64.    Traditional fantasy sports were played between friends and family over the course of a sports season, for small amounts of collectively pooled money or for no money at all.

65.    Here are several other examples of critical differences of how Underdog's Drafts and Pick'em products differ from traditional fantasy sports.

66.    **First,** unlike traditional fantasy sports that are played between friends and family, Underdog's Pick'em product sets up contests between the users and Underdog—who serves as the house—through its Gambling Websites.

67.    **Second,** unlike traditional fantasy sports that are played between friends and family, Underdog's Drafts set up contests between strangers through its Gambling Websites.[17] Many of the

---

[16] Plaintiff notes that he is specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make his allegations in the alternative, and accordingly, alleges that the gambling contests offered in California by Underdog constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

[17] In certain limited instances, it appears that users can play against individuals they know, but on

Underdog Drafts contests offered include hundreds or thousands of participants, as compared to traditional fantasy sports, that might have had around a dozen participants.

68.    **Third,** unlike traditional fantasy sports, for both Drafts and Pick'em, Underdog collects, documents (i.e., books), and holds all bets and wagers, and then Underdog uses its records (i.e., Underdog's betting book) to determine winners and losers and to calculate payouts.

69.    **Fourth,** unlike traditional fantasy sports, in Pick'em, Underdog serves as the "house," taking on all contestants, paying all winners, and collecting from all losers.

70.    **Fifth,** unlike traditional fantasy sports, in Pick'em, the "Higher" and "Lower" lines are all set by Underdog, just as in a traditional sports book betting gambling operation.

71.    **Sixth,** unlike traditional fantasy sports, Pick'em has the effect of creating a "parlay" structure, where a user has to correctly select multiple independent outcomes in order to win his bet against Underdog.

72.    **Seventh,** unlike traditional fantasy sports, in Drafts, Underdog takes a portion of each pool of bets and wagers, even though it is not a participant in the contest.

73.    **Eighth,** unlike traditional fantasy sports, in Drafts, the size of the bets and wagers, the number of participants, the pool size of bets and wagers, the prize pools made available as "winnings," and the portions of the bets, wagers, and pools kept by Underdog are all set by Underdog.

74.    **Ninth,** unlike traditional fantasy sports, in Drafts, the size of the bets and wagers, the number of participants, the pool sizes of bets and wagers collected, the prize pools made available as "winnings," and the portions of the bets, wagers, and pools kept by Underdog vary dramatically, even when betting on the same underlying professional sporting event.

75.    **Tenth,** unlike traditional fantasy sports, in Drafts, Underdog maintains records of all bets and wagers placed on Drafts, and uses those records (i.e., the betting books) to calculate post-contest payouts to participants from the pool of bets and wagers.

---

information and belief, such transactions make up only a small portion of all Underdog California-based bets.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

76.    **Eleventh,** unlike traditional fantasy sports, which generally last throughout an entire sports season (e.g., the NFL regular football season), both Drafts and Pick'em involve short periods of participation and are designed to entice multiple rounds of repeat betting over the course of a day, a weekend, or a week.[18]

77.    **Finally,** unlike traditional fantasy sports, Underdog offers users the opportunity to enter contests across a multitude of sporting types at the same time. For example, in June 2025, Underdog offered contests on MLB, the WNBA, the NBA, NHL, soccer, the PGA, and esports, including Counter-Strike, among others, on the Gambling Websites in California.

78.    Ultimately, regardless of which contest Underdog's users select, they have no control over the outcome of the fantasy game they have wagered on. The outcome is determined entirely based on athletes' actual in-game performances (i.e., the athletes' performance in the actual underlying sporting events) and are entirely outside of the user's control.

79.    In addition, with respect to at least Drafts, "[c]hance affects the result not only as to the person or persons to receive the pool proceeds, but as to the amount received by any winning player, since more than one player may have selected the [same winning combination on] a particular day." *Finster*, 18 Cal. App. 3d at 845.

80.    Put simply, the outcomes of Underdog's contests are contingent and unknown at the time the bets and wagers are collected and recorded (i.e., booked) by Underdog. And as a result, Underdog's contests violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.[19]

---

[18] In fact, the sports betting industry is facing lawsuits across the country related to the addictive nature of their online betting platforms. While those claims are not at issue in this lawsuit, the California legislature has also expressly noted the addictive nature of gambling: "Gambling can become addictive and is not an activity to be promoted or legitimized as entertainment for children and families." Cal. Bus. & Prof. Code § 19801(c).

[19] Plaintiff notes that he is specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make his allegations in the alternative, and accordingly, alleges that the gambling contests offered in California by Underdog constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

### 4. Underdog Solicits California Users Through a Comprehensive Advertising Campaign that Is Specifically Directed at California Consumers.

81.    Online fantasy sports bet operators spend billions of dollars each year on advertising and marketing,[20] with MediaRadar reporting that Underdog alone spends over $25 million a year.[21]

82.    The reason Underdog spends over $25 million each year on advertisements and marketing is to expand and maintain its userbase, including within California, which is the largest daily fantasy market in the country.

83.    For example, Underdog runs extensive advertisements on television as well as on YouTube, Facebook, and Twitter (including within California) featuring celebrities and promotional offers to attract new customers. One recent example is a TV commercial featuring Bill Belichick, Bryson DeChambeau, Cam'ron, and Tyrese Maxey.[22]

84.    Underdog is also the Official Daily Fantasy Partner of the United Football League.[23] As part of this sponsorship, Underdog was prominently featured in United Football League broadcasts on FOX.

/ / /

/ / /

/ / /

---

[20] *How Much Sportsbooks Spend on Marketing (2025 Updated Stats!),* available online at https://www.scaleo.io/blog/how-much-sportsbooks-spend-on-marketing-2024-updated-stats/ (last visited June 30, 2025)

[21] https://www.mediaradar.com/blog/blog/q4-2023-12-for-24-gambling (last visited June 30, 2025)

[22] https://www.ispot.tv/ad/f15n/underdog-fantasy-we-only-need-one-yard-featuring-bill-belichick (last visited June 30, 2025)

[23] *See* https://www.sportsinsider.com/underdog-fantasy-becomes-exclusive-fantasy-sports-partner-for-united-football-league/#:~:text=Underdog%20Fantasy%20Becomes%20Exclusive%20Fantasy%20Sports%20Partner,TV%20coverage%20on%20the%20FOX%20Sports%20networks. (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

85.    Underdog also extensively features promotions and referral programs to engage new and existing customers:[24]



86.    Put simply, Underdog has a comprehensive marketing and customer solicitation strategy, that includes soliciting new and existing customers to use Underdog, including within California.

87.    Those ads work, with hundreds of thousands (if not millions) of Californians using Underdog's Gambling Websites to place bets and wagers on Underdog gambling contests.

---

[24] https://underdogfantasy.com/ (last visited June 30, 2025).

**5.    Once Potential Customers Arrive on the Underdog Gambling Websites, They Are Repeatedly Assured that Underdog Is Properly Operating in California.**

88.    Well aware that customers would otherwise refuse to play its daily fantasy sports contests if they knew and understood those contests violated California criminal law, on its website, Underdog repeatedly assures prospective customers that daily fantasy sports generally and Underdog specifically are permitted in California.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

89.    For example, on the main Underdog landing page, UnderdogFantasy.com, one of the first sections a user encounters includes a header stating, "Available in 41 States, Washington DC & Canada."[25]   This section features a map showing that Drafts and Pick'em are available in California (among many other states):



<hr />

[25] https://underdogfantasy.com/ (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

90.     The rules page on Underdog's website includes a section entitled "Ineligible states," which states: "Underdog is not currently available in every US state, sometimes due to state regulations or to pending applications,"[26] and goes on to specifically identify the states where Underdog does not operate.  California is not included on Underdog's list of states and territories in which Drafts and Pick'em are not available..

91.     In addition, if a user attempts to explore the Gambling Websites before creating an account, he is expressly blocked from seeing many webpages until an account is created.

92.     Location sharing is required in order to place bets on the Gambling Websites. This location sharing requirement leads users to understand and expect that Underdog is monitoring location information in order to ensure legal compliance by users.

93.     Further, Underdog makes numerous representations about the age requirements needed to participate in its fantasy contests, noting that the requirements vary by state, for example:



94.     And here is what Underdog says about age requirements in its Terms of Use:[27]

**23. Age Restrictions**

Fantasy Contests are generally restricted to users over the age of 18, but some states impose a higher minimum age. If you are under 18 or the minimum age in your state of residence, you may not access the Services.

---

[26] https://underdogfantasy.com/rules (last visited June 30, 2025).

[27] Underdog Fantasy Terms of Use dated February 26, 2025, available online at https://legal.underdogfantasy.com/?g=42203#terms-of-use (last visited June 30, 2025)

95.    Likewise, Underdog includes numerous statements about assistance with problem gambling support resources, that appear to be state specific and/or state mandated, for example:[28]

🎧 **Underdog Responsible Gaming**

## Concerned with your play?

Call 1-800-GAMBLER or visit www.ncpgambling.org; AZ: 1-800-NEXT-STEP (1-800-639-8783) or text NEXT-STEP to 53342; NC: Gambling Problem? Call 1-877-718-5543, visit morethanagame.nc.gov, or call 1-800-GAMBLER; NY: Call the 24/7 HOPEline at 1-877-8-HOPENY or Text HOPENY (467369) Learn more about Underdog Contests and how to identify highly experienced players at www.underdogfantasy.com/rules; Learn more about average results at www.underdogfantasy.com/average-results

/ / /

/ / /

/ / /

---

[28] https://underdogfantasy.com/login?next=%2Flobby (last visited June 30, 2025).

96.    In contrast to its representations that Drafts and Pick'em are permitted in California, Underdog's landing page shows that Underdog's Champions product is not legal in California:



CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

97.     Underdog's affirmative representations about where Underdog is permitted leads users to understand that Underdog has carefully reviewed the gambling laws of California and other states and concluded that certain products are lawful in California and others are not.

98.     Plaintiff's and the Class's (as defined below) reliance on such representations from Underdog were entirely reasonable, as Underdog effectively holds itself out as an expert on the nuances of gambling law and regulation across the United States.

99.     Similar representations are made on the mobile apps, for example:



CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

100.    Put simply, Underdog intentionally and strategically leads—in fact, misleads—consumers into believing that its operation of the Gambling Websites in California is legal.

101.    It is not.

**E.    Plaintiff's Experiences.**

102.    At all times relevant to this action Plaintiff O'Sean Head has resided in Contra Costa County, California.

103.    In or about 2022, in response to advertisements he had seen on television and on Instagram, Plaintiff Head created an account with Underdog. Underdog represented to Plaintiff Head that the products and services it offered in California were legal.

104.    Since that time, Underdog has continued to represent to Plaintiff Head including on the Gambling Websites themselves—that its services are legal in California.

105.    In setting up and using his Underdog account, Plaintiff Head expressly relied upon Underdog's representations that the services it provides in California are legal.

106.    If Underdog had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff Head would not have created an account with Underdog in California and would not have placed bets while in California through Underdog's Gambling Websites.

107.    Since creating his account in or about 2022, Plaintiff Head has lost more than $1,000 to Underdog while in California.

108.    If Underdog had not solicited bets and wagers from Plaintiff Head while representing that such activities were legal (when, unknown to Plaintiff Head at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to Underdog.

109.    Among other gambling options offered by Underdog in California, Plaintiff Head has played Pick 'Em while in California and lost money to Underdog.

110.    In Plaintiff Head's experience, Underdog serves as the "house," setting the betting lines, taking bets and wagers from all users, documenting (i.e., "booking") those bets, using its records to determine "winners" and "losers," and eventually paying out the winners.

111.    Plaintiff has gambled with Underdog as recently as June 2025, while in California, betting on Pick 'Em and lost about $10.00 that was paid to and kept by Underdog.

112.    While Plaintiff Head has now discontinued the use of Underdog while in California, he remains interested in online gambling in California, and if it becomes legal, he would continue to gamble online in California. Plaintiff Head may be tricked by Underdog in the future into engaging in unlawful gambling in California if Underdog continues to claim that its practices are legal.

113.    Plaintiff Head's sole reason for setting up an account with Underdog and purportedly consenting to Underdog' terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation) was to gain access to the gambling services in California offered by Underdog that he now understands violate California law.

114.    Said differently, to the extent a contract was formed between Plaintiff Head and Underdog, Plaintiff Head's sole reason for entering into that contract was to engage in the unlawful gambling activities that are at issue in this Complaint.

115.    Accordingly, Plaintiff Head's contract with Underdog (to the extent any such contract was otherwise ever formed), is void (and was void *ab initio*) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to any express provision of the law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."

**F.    Plaintiff's Claims Are Not Subject to Arbitration.**

116.    Plaintiff's sole reason for setting up an account with Underdog and purportedly consenting to Underdog's terms of use (which he did not review and was not aware he was purportedly agreeing to at the time of account creation or otherwise) was to gain access to the gambling services in California offered by Underdog that he now understands violate California law.

117.    Said differently, to the extent a contract was formed between Plaintiff and Underdog, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

118.    Accordingly, Plaintiff's contract with Underdog (to the extent any such contract was otherwise ever formed), is void (and was void *ab initio*) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."[29]

**G.    Underdog's Affirmative Misrepresentations Have Tolled the Statute of Limitations.**

119.    As detailed above, Underdog has consistently and explicitly represented to the public and its customers, including Plaintiff and the Class (as defined below), that its operation of the Gambling Websites in California is permissible and legal.

120.    Among other things, Underdogs has held itself out as being an expert on gambling law and regulations, and induced Plaintiff and the Class to rely on its affirmative false representations and statements in order to secure Plaintiff's and the Class's use of the Gambling Websites and to keep Plaintiff and the Class using the unlawful Gambling Websites in California.

121.    As a direct and proximate result of Underdog's affirmative misrepresentations and statements, Plaintiff and the Class had no reason to believe that operation of the Gambling Websites was unlawful. In fact, just the opposite. They trusted and relied upon Underdog's purported expertise in California gambling law and regulation.

122.    Plaintiff and the Class were unable to discover—and in fact, did not discover—the true and unlawful nature of the Gambling Websites on their own, as, on information and belief, Underdog and others in the online gambling industry have inundated the internet and other publicly available resources (e.g., news articles and legal blogs) with claims that daily fantasy sports betting contests and other betting contests, like Drafts and Pick'em, are legal in California.

123.    When Plaintiff did finally learn the true unlawful nature of the Gambling Websites' operation in or about July of 2025, Plaintiff promptly filed this lawsuit.

---

[29] Plaintiff expressly reserves this right to contest the Underdog Terms of Use on additional and separate grounds in response to any motion brought by Underdog or otherwise.

**H.    Underdog Acted with Malice, Oppression, and Fraud.**

124.    As detailed in this Complaint, Underdog has acted with malice, oppression, and fraud.

125.    Underdog acted with malice, because, among other reasons and as otherwise detailed in this Complaint, Underdog's conduct was despicable and was done with a willful and knowing disregard of the rights of the public, Plaintiff, and the Class (as defined below) because Underdog knew (or should have known) that its gambling operations in California were illegal, but despite that induced Plaintiff and the Class to gamble and lose money through its Gambling Websites while in California. As the California legislature has repeatedly made clear, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

126.    Underdog's conduct was oppressive because, among other reasons and as otherwise detailed in this Complaint, it was despicable and subjected Plaintiff and the Class to cruel and unjust hardship in knowing disregard of their rights, including by falsely inducing them to lose significant sums of money through the illegal gambling enterprise that Underdog held out as being legal in California.

127.    Underdog's conduct was fraudulent, because, among other reasons and as otherwise detailed in this Complaint, Underdog intentionally misrepresented and concealed the true nature of its unlawful gambling enterprise from Plaintiff and the Class by affirmatively representing that the Gambling Websites and associated contests were legal in California when Underdog knew (or should have known) that such contests were not.

**I.    Plaintiff and the Class Lack an Adequate Remedy at Law.**

128.    Plaintiff and the Class (as defined below) have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of Defendants' violation of law and wrongful conduct alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and Class are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the

-32-

standard that governs damages. As such, the Court may award restitution even if it determines that Plaintiff and the Class fail to sufficiently adduce evidence to support an award of damages. Further, damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money a defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds have grown far greater than the legal rate of interest would recognize. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

129. Equitable relief is appropriate because Plaintiff and the Class may lack an adequate remedy at law if, for instance, damages resulting from their use of the Gambling Websites is determined to be an amount less than paid to use the Gambling Websites. Without compensation for the full amount paid, Plaintiff and the Class would be left without the remedy they are entitled to in equity.

## VI. CLASS ALLEGATIONS

130. This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure Rule 23, including, without limitation, Sections (b)(1), (b)(2), and (b)(3) of Rule 23.

131. Plaintiff seeks certification of the following class (the "Class"):

> All persons who placed a bet or wager on the Gambling Websites while in California.

132. The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel, and non-attorney

employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

133.    Underdog's practices have resulted in actual injury and harm to the Class members in the amount of deposits made with Underdog and/or losses incurred on the Gambling Websites for bets or wagers placed while in California.

134.    Plaintiff explicitly reserves his right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

135.    **Numerosity.** Plaintiff is informed and believes that there are hundreds of thousands or potentially millions of members of the Class. The Class is so large that the joinder of all of its members is impracticable. The exact number of members of the Class can be determined from information in the possession and control of Underdog.

136.    **Commonality.** Underdog has acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Underdog and/or Plaintiff and the Class. Numerous common issues of fact and law exist, including, without limitation:

    a.    What gambling contests Underdog offers in California.

    b.    What mediums (e.g., website, app, in person, etc.) Underdog offers its gambling contests through in California.

    c.    The dates and number of gambling contests offered by Underdog in California.

    d.    Whether Underdog violates California Penal Code Section 319 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

    e.    Whether Underdog violates California Penal Code Section 320 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

f.      Whether Underdog violates California Penal Code Section 321 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

g.      Whether Underdog violates California Penal Code Section 330 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

h.      Whether Underdog violates California Penal Code Section 330a by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

i.      Whether Underdog violates California Penal Code Section 337a by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

j.      Whether Underdog violates any additional sections of the California Penal Code or other applicable California law and/or regulation by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

k.      Whether Underdog's violations of the California Penal Code give rise to liability under California's unfair competition law.

l.      Whether Underdog is a "person" within the meaning of Section 1761(c) of the California Consumer Legal Remedies Act ("CLRA").

m.      Whether Plaintiff and the Class are "consumers" within the meaning of Section 1761(d) of the CLRA.

n.      Whether Underdog's practices violate the following CLRA Sections, among others:

i.      "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

ii.     "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

-35-

iii. **"**Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

iv. "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

v. "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

vi. "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

vii. "Inserting an unconscionable provision in the contract" (a)(19).

o. Whether Underdog's operation of the Gambling Websites should be enjoined in California.

p. The appropriate model for calculating damages, equitable restitution, and/or equitable disgorgement.

q. Whether Underdog's affirmative misrepresentations that the Gambling Websites are legal tolled any otherwise applicable statutes of limitations.

r. Whether any subset of claims held by the Class are barred by the statute of limitations.

137. **Predominance.** These common issues predominate over individualized inquiries in this action because Underdog's liability can be established as to all members of the Class as discussed herein.

138. **Typicality.** Plaintiff's claims against Underdog and experience with Underdog are typical, if not identical, to the claims and experiences of members of the Class because, among

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

other reasons, Plaintiff's claims arise from Underdog's practices that are applicable to the entire Class.

139.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money to Underdog. Plaintiff also has no interests antagonistic to those of the Class, and Underdog has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the Class.

140.    **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to receive equitable monetary relief; the equitable monetary relief suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiff and his counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

141.    Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## VII.    CAUSES OF ACTION

**A.    First Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, ("UCL") on Behalf of Plaintiff and the Class.**

142.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 141, inclusive, of this Complaint.

143.    Underdog, Plaintiff, and Class are "persons" within the meaning of the UCL.

144.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

-37-

145.    Underdog's practices of operating the Gambling Websites within California are "unlawful" within the meaning of the UCL because, among other things, the operation of the Gambling Websites violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j because, among other reasons, in the course of business and in the course of trade and commerce, Underdog has:

a.    Operated illegal lotteries and/or games of chance in violation of Penal Code Sections 319, 320, 321, 330a, and 337j by operating the Gambling Websites and Drafts and Pick'em contests in California.[30]

b.    Operated banking and/or percentage gambling games in violation of Penal Code Section 330 by operating the Gambling Websites and Drafts and Pick'em contests in California.

c.    Engaged in pool selling in violation of Penal Code Section 337(a)(1) by operating the Gambling Websites and Drafts and Pick'em contests in California.[31]

d.    Engaged in bookmaking in violation of Penal Code Section 337(a)(1) by operating the Gambling Websites and Drafts and Pick'em contests in California.

e.    Violated Penal Code Section 337(a)(3) by "receiv[ing], hold[ing], or forward[ing] . . . money . . . staked, pledged, bet or wagered . . upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance,

---

[30] Plaintiff notes that he is specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make his allegations in the alternative, and accordingly, alleges that the gambling contests offered in California by Underdog constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

[31] Plaintiff expressly state his allegation of "pool selling" as an alternative to his "banking game" allegation, to the extent there is any inconsistency between these allegations.

casualty, unknown or contingent event whatsoever" by operating the Gambling Websites and Drafts and Pick'em contests in California.

    f.    Violated Penal Code Section 337(a)(4) by "record[ing], or register[ing] any bet or bets, wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating the Gambling Websites and Drafts and Pick'em contests in California.

    g.    Violated Penal Code Section 337(a)(6) by "[o]ffer[ing] or accept[ing] any bet or bets, or wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus" by operating the Gambling Websites and Drafts and Pick'em contests in California.

146.    Underdog's operation of the Gambling Websites and Drafts and Pick'em contests within California is also unlawful within the meaning of the UCL because Underdog has violated the CLRA, as alleged in the Second Cause of Action, below.

147.    Underdog's operation of the Gambling Websites and Drafts and Pick'em contests within California is also unlawful within the meaning of the UCL because Underdog has violated the California Business and Professions Code, because "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

148.    The acts and practices of Underdog as alleged herein also constitute "unfair" business acts and practices under the UCL because Underdog's conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of Underdog's conduct outweighs any conceivable benefit of such conduct.

149.    Underdog has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing operation of the Gambling Websites and Drafts and Pick'em contests are lawful in California, when in fact, they are not, causing Plaintiff and the Class to be tricked out of tens of millions of dollars.

150.    Plaintiff and the Class have suffered injury in fact—in the form of all amounts paid to Underdog and/or the total of net losses on the Gambling Websites run by Underdog for bets placed within California—as a result of Underdog's unlawful and unfair business acts and practices and are at substantial risk of continuing to lose money and be injured by those acts and practices if the practices are not enjoined.

151.    Plaintiff seeks all available remedies under the UCL, including an order providing restitution and/or disgorgement in the form of all amounts paid to Underdog by Plaintiff and the Class and/or the total of net losses on the Gambling Websites by Plaintiff and the Class for bets placed within California.

152.    Plaintiff further seeks an equitable order enjoining the unlawful practices.

153.    Plaintiff and members of the proposed Classes have no adequate remedy at law and are therefore entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of Defendants' ill-gotten gains, and/or other sums as may be just and equitable.

154.    Plaintiff and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiff and the Class seek to enforce "an important right affecting the public interest" in bringing this UCL claim and this action.

**B.    Second Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.*, on Behalf of Plaintiff and the Class.**

155.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 141, inclusive, of this Complaint.

156.    At all relevant times, Plaintiff and Class members were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

157.    Underdog's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA, namely the selling of the unlawful gambling goods and services that are at issue in this action through the Gambling Websites.

158.    Underdog violated the CLRA by, among other things:

    a.    "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

    b.    "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

    c.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

    d.    "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

    e.    "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

    f.    "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

    g.    "Inserting an unconscionable provision in the contract" (a)(19).

159.    Underdog's actions and misrepresentations were material, and Underdog's violations of the CLRA were a substantial factor in causing Plaintiff and the Class to lose money.

160.    As a direct and proximate consequence of these actions, Plaintiff and the Class suffered injury.

161.    Underdog's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiff and the Class for Defendants' own benefit to the detriment of Plaintiff and the Class.

162.    The CLRA provides robust enforcement tools for consumers, including:

a.    Prohibiting the waiver of any substantive rights provided for under the CLRA. *Id.* § 1750

b.    Requiring that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

c.    Establishing a substantive right to litigate in the forum where the transaction occurred and/or where the consumer lives. *Id.* § 1780(d).

d.    Establishing a substantive right to pursue class claims. *Id.* § 1781; see also *id.* § 1752.

e.    Authorizing injunctive relief. *Id.* § 1780(a)(2)

f.    Authorizing actual damages. *Id.* § 1780(a)(1).

g.    Authorizing restitution of unlawfully taken sums. *Id.* § 1780(a)(3).

h.    Authorizing punitive damages. *Id.* § 1780(a)(4).

i.    Authorizing statutory damages of $1,000 per violation. *Id.* § 1780(a)(1).

j.    Authorizing statutory damages of $5,000 per injured individual, where the unlawful conduct was directed against the elderly or the disabled. *Id.* § 1780(b)(1).

k.    Requiring that the Court "shall award court costs and attorney's fees to a prevailing plaintiff in litigation." *Id.* § 1780(e).

163.    Plaintiff seeks all available remedies under the CLRA, except that, at this time, Plaintiff does not seek any monetary damages for the CLRA cause of action.[32]

_____

[32] Pursuant to Section 1782(d) of the CLRA, Plaintiff expressly reserves his right to amend his CLRA cause of action to add claims for monetary relief, including, without limitation, for actual,

1

## VIII.    PRAYER FOR RELIEF

2      164.    Plaintiff, individually and on behalf of all others similarly situated, respectfully

3  requests that this Court enter an Order:

4              a.    Certifying the proposed Class pursuant to Rule 23, appointing

5                    Plaintiff as Class Representative, and appointing his counsel as Class

6                    Counsel;

7              b.    Declaring that Underdog is financially responsible for notifying the

8                    Class members of the pendency of this suit;

9              c.    Finding that Underdog has committed the violations of law alleged

10                   herein;

11             d.    Providing for any and all injunctive relief the Court deems

12                   appropriate;

13             e.    Awarding monetary relief, including but not limited to restitution in

14                   an amount that the Court or jury will determine, in accordance with

15                   applicable law;

16  / / /

17  / / /

18  / / /

19

20

21

22

23

24

25

26

27

28

---

punitive, and statutory damages, at least 30 days after providing Underdog the notice contemplated by Section 1782(a).

-43-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1             f.      Providing for any and all other equitable monetary relief the Court

2                 deems appropriate;

3             g.      Awarding Plaintiff his reasonable costs and expenses of suit,

4                 including attorney's fees;

5             h.      Awarding pre- and post-judgement interest to extent the law allows;

6                 and

7             i.      Providing such further relief as this Court may deem just and proper.

8

9 Respectfully submitted,

10

Dated: July 1, 2025                 By:   */s/ Wesley M. Griffith*

11                            Wesley M. Griffith, SBN 286390

12                            **ALMEIDA LAW GROUP LLC**
                           111 W. Ocean Blvd, Suite 426

13                            Long Beach, CA 90802
                           Telephone: 310-896-5813

14                            E-mail: wes@almeidalawgroup.com

15                            Margot Cutter, SBN 306789
                           **CUTTER LAW P.C.**

16                            401 Watt Avenue
                           Sacramento, CA 95864

17                            Telephone: 916-290-9400
                           E-mail: mcutter@cutterlaw.com

18

19                            F. Peter Silva II Aizpuru, SBN 348070
                           Katherine M. Aizpuru, *pro hac vice* to be filed

20                            Robert M. Devling, *pro hac vice* to be filed
                           **TYCKO & ZAVAREEI LLP**

21                            2000 Pennsylvania Avenue, NW, Suite 1010
                           Washington, District of Columbia 20006

22                            Telephone: 202-973-0900
                           E-mail: psilva@tzlegal.com

23                            E-mail: kaizpuru@tzlegal.com
                           E-mail: rdevliing@tzlegal.com

24                            James Bisborrow, *pro hac vice* to be filed
                           Aaron Freedman, *pro hac vice* to be filed

25                            **WEITZ & LUXENBERG PC**
                           700 Broadway

26                            New York, NY 10003
                           Telephone: 212-344-5461

27                            E-mail: jbilsborrow@weitzlux.com
                           E-mail: afreedman@weitzlux.com

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Christopher Nienhaus, *pro hac vice* to be filed
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave
Chicago, IL 60614
Telephone: 708-529-5418
E-mail: chris@almeidalawgroup.com

*Counsel for Plaintiff and the Proposed Class*

-45-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

## IX.    DEMAND FOR TRIAL BY JURY

2      Plaintiff, on behalf of himself and the putative Class, hereby respectfully demands a trial by

3  jury on all claims for which a jury trial is available.

4

5  Dated: July 1, 2025                          By:  */s/ Wesley M. Griffith*
                                               Wesley M. Griffith, SBN 286390
6                                              **ALMEIDA LAW GROUP LLC**
                                               111 W. Ocean Blvd, Suite 426
7                                              Long Beach, CA 90802
                                               Telephone: 310-896-5813
8                                              E-mail: wes@almeidalawgroup.com

9                                              Margot Cutter, SBN 306789
                                               **CUTTER LAW P.C.**
10                                             401 Watt Avenue
                                               Sacramento, CA 95864
11                                             Telephone: 916-290-9400
                                               E-mail: mcutter@cutterlaw.com

12                                             F. Peter Silva II Aizpuru, SBN 348070
                                               Katherine M. Aizpuru, *pro hac vice* to be filed
13                                             Robert M. Devling, *pro hac vice* to be filed
                                               **TYCKO & ZAVAREEI LLP**
14                                             2000 Pennsylvania Avenue, NW, Suite 1010
                                               Washington, District of Columbia 20006
15                                             Telephone: 202-973-0900
                                               E-mail: psilva@tzlegal.com
16                                             E-mail: kaizpuru@tzlegal.com
                                               E-mail: rdevling@tzlegal.com
17

18                                             James Bisborrow, *pro hac vice* to be filed
                                               Aaron Freedman, *pro hac vice* to be filed
19                                             **WEITZ & LUXENBERG PC**
                                               700 Broadway
20                                             New York, NY 10003
                                               Telephone: 212-344-5461
21                                             E-mail: jbilsborrow@weitzlux.com
                                               E-mail: afreedman@weitzlux.com
22

23                                             Christopher Nienhaus, *pro hac vice* to be filed
                                               **ALMEIDA LAW GROUP LLC**
                                               849 W. Webster Ave
24                                             Chicago, IL 60614
                                               Telephone: 708-529-5418
25                                             E-mail: chris@almeidalawgroup.com

26                                             *Counsel for Plaintiff and the Proposed Class*

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL